# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT SORICH, TIMOTHY McCARTHY, and PATRICK SLATTERY, | ) ) ) | |
| Petitioners, | ) ) | Nos.  10 C 1069, 10 C 1089, and 10 C 1091 |
| v. | ) ) | Judge Joan H. Lefkow |
| UNITED STATES OF AMERICA, | ) ) | |
| Respondent. | ) | |

## OPINION AND ORDER

In July 2006, following a jury trial, petitioners Robert Sorich, Timothy McCarthy, and

Patrick Slattery (collectively, "petitioners") were convicted of mail fraud.[1]  Sorich was sentenced

to forty-six months' imprisonment and a $10,000 fine.  McCarthy was sentenced to nineteen

months' imprisonment and a $5,000 fine.  Slattery received a twenty-seven month sentence and a

$5,000 fine.  Their convictions and sentences were affirmed by the Seventh Circuit.  That court

denied rehearing *en banc*, over the dissent of Judge Kanne and Judge Posner, and the Supreme

Court denied *certiorari*, over Justice Scalia's dissent.  Petitioners then timely filed a petition

pursuant to 28 U.S.C. § 2255 seeking to vacate their convictions.[2]  Briefing on the petition was

stayed pending the Supreme Court's consideration of the constitutionality of the honest services

---

[1] The fourth defendant indicted in the case, John Sullivan, was convicted of one count of making materially false statements to federal investigators.  He has not joined in this § 2255 petition.

[2] While petitioners are no longer in custody, this fact does not render their petition moot.  *Torzala* v. *United States*, 545 F.3d 517, 521 (7th Cir. 2008).  Sorich was in custody when his petition was filed, and McCarthy and Slattery were on supervised release, which has been recognized as a form of custody for purposes of § 2255's "in custody" requirement.  *Kusay* v. *United States*, 62 F.3d 192, 193 (7th Cir. 1995).

statute, 18 U.S.C. § 1346, in three cases, *Black*, *Skilling*, and *Weyhrauch*, that were pending before it. In *Skilling*, the Court limited the scope of the honest services statute to cases involving bribes and kickbacks. *Skilling* v. *United States*, --- U.S. ----, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010). Based on this decision, petitioners argue that their convictions should be set aside. For the following reasons, the court denies the § 2255 petitions.

## BACKGROUND

After the City of Chicago's hiring practices were challenged in federal court, the city agreed, in what is known as the *Shakman* decree, that employment decisions for the large majority of city jobs (non-*Shakman* exempt positions) are not to be based in any part on political considerations. A system was put into place to ensure compliance with the *Shakman* decree, including requiring that certifications be signed attesting that politics played no role in the hiring process. Despite these policies, hiring and promotions continued to be influenced by political factors.

Petitioners are former city employees who were involved in the circumvention of the *Shakman* decree by awarding city civil service jobs and promotions to individuals based on political patronage and nepotism. This scheme was run out of the city's Office of Intergovernmental Affairs ("IGA"), which formally served as a liaison between the mayor's office and other city, state, and federal governmental units. Unofficially, however, IGA functioned as the patronage office, doling out jobs based not necessarily on merit but rather on political work.[3] The patronage hiring scheme penetrated various city departments, including the

---

[3] Certain policymaking jobs are considered *Shakman*-exempt. IGA officially had a role in hiring for *Shakman*-exempt positions.

Departments of Sewers, Streets and Sanitation, and Water.[4] Sorich, the assistant to IGA's director from 1993 to July 2005, was at the center of the patronage system. McCarthy became Sorich's righthand man in 2001 when he joined IGA after working as an assistant commissioner charged with hiring and promotions at the Department of Aviation. Slattery, also a long-time city employee and Sorich's good friend, was the director of staff services for the Department of Streets and Sanitation from 2000 to 2004, supervising the hiring and promotion process.

After a federal investigation into the city's hired truck program led to an investigation of the city's hiring practices, petitioners were indicted on September 22, 2005. A second superseding eight-count indictment was returned on April 27, 2006. Petitioners were charged with violating 18 U.S.C. § 1341 and § 1346 as part of a scheme to

> defraud the people of the City, and the City, of money, property and the intangible right to the honest services of SORICH, McCARTHY, SULLIVAN, SLATTERY, Katalinic[5] and other City employees participating in the hiring and promotion process, and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises and material omissions . . . .

Crim. R. 140, ¶ 12.[6] Each count charged a separate mailing made in furtherance of the scheme. The government's honest services theory was based, in large part, on violations of the *Shakman* decree. The court ruled in a pretrial motion that the indictment did allege a deprivation of money

---

[4] Evidence was also presented at trial of patronage hiring at the Departments of Aviation, Buildings, General Services, and Transportation.

[5] From 2000 to 2003, Dan Katalinic was deputy commissioner of street operations for Streets and Sanitation and also had his own political organization. He pleaded guilty to the charges in the indictment and testified at petitioners' trial.

[6] Documents from petitioners' criminal case, No. 05 CR 644, will be referred to as "Crim. R. [docket number]." Citations to the trial transcript will be referred to as "Trial Tr. [page number]."

or property, namely the city's property right to control how its money is spent. *United States* v. *Sorich* (*Sorich I*), 427 F. Supp. 2d 820, 827–28 (N.D. Ill. 2006).

The case was tried to a jury over an eight-week period. After several days of deliberation, the jury returned a general verdict on each count. Sorich was convicted of two counts of mail fraud and acquitted of two counts, while McCarthy and Slattery were each convicted of one count of mail fraud.[7] A summary of the trial follows.

## I. Opening Statements

The government opened its presentation stating that the case was about "breach of the public trust," a trust petitioners "had a duty to uphold on behalf of the taxpayers and the residents of the City of Chicago." Trial Tr. 33:10–11, 13–14. It explained that the case was about "rewarding political workers with City jobs," "rigging the promotion process for City jobs," and "violating the law, including [the *Shakman*] federal court order which unmistakably and unequivocally banned political considerations for these very jobs." *Id.* at 37:25–38:4. The government specified that petitioners sought to defraud the city and its taxpayers of jobs: "the currency and the fuel and the gasoline for this scheme were [city] jobs." *Id.* at 42:13–14; *see also id.* at 41:19–20 ("[T]he property we're talking about is the jobs."); *id.* at 77:13–17 ("But when taxpayer jobs are the fuel for this scheme, are the reward or the carrot for participating in the Mayor's organization, political organization, that's wrong, and we submit to you that the evidence will show at the end of the case that that's a crime."). The government maintained that the evidence would show that petitioners committed fraud by rigging the hiring process in favor

---

[7] The government dismissed one count of mail fraud, in which all defendants were charged, at trial.

4

of those who were politically active or had clout. *Id.* at 76:8–15. The losers of the scheme were said to be qualified but unsuccessful and unconnected city job applicants and city taxpayers. *Id.* at 78:12–13, 18–20.

Petitioners maintained that their actions were not criminal. They contended that a *Shakman* violation, even if shown, did not amount to mail fraud. *Id.* at 81:17–23, 123:1–6. Sorich and McCarthy also emphasized that they only made recommendations for jobs, *see, e.g.*, *id.* at 129–30, 138–39, and that there were many instances where IGA's recommendations were not followed, *see, e.g.*, *id.* at 142. Slattery maintained that he took valid considerations into account when filling out rating forms for hiring sequences. *Id.* at 188–90, 196–97. Slattery also predicted that the evidence would not show that he was aware that IGA was dictating personnel decisions. *Id.* at 201–02.

## II.    Evidence

The government presented various witnesses, many of whom were also implicated in the scheme and thus testified under grants of immunity or plea agreements. Mary Jo Falcon, Phyllis Bergthold, and Jack Drumgould, former personnel officers at Sewers, Water, and General Services and Streets and Sanitation, respectively, testified that they would receive a list (which Falcon called the "blessed list," *id.* at 519) from Sorich or McCarthy with names of people who should be interviewed and hired for specific positions. *See, e.g.*, *id.* at 207–305 (Falcon); 2654–60 (Bergthold); *id.* at 1321–33 (Drumgould). At times, the list was provided after interviews had already taken place, meaning that interview rating forms were filled out after the fact and not actually based on previously taken notes. *Id.* at 1084 (testimony of John Kosiba, former assistant commissioner of Water); *id.* at 1396 (Drumgould). Scores given to candidates

reflected not their qualifications but rather whether the candidate was on IGA's list or not.[8]  *Id.* at

1411.  Whether Sorich was even aware of the requirements for certain positions or his

recommended hires' job skills was called into doubt by the testimony.  *See id.* at 1746.

Catharine Hennessy, who worked as a labor relations liaison in Streets and Sanitation, testified

that, in response to a union inquiry about a hiring sequence, Slattery told her that the selection

process was not based on performance or attendance.  *Id.* at 2264.  Several witnesses testified

that the most qualified applicants often were not selected.  *Id.* at 1783, 1786, 1802 (testimony of

Hugh Donlan, personnel liaison in Streets and Sanitation's Bureau of Electricity); *id.* at 2476–77

(testimony of Donald Tomczak, former first deputy commissioner of Water); *id.* at 2758

(testimony of Carmen Iacullo, former deputy commissioner of Transportation).  Tomczak

testified that, due to the inexperience and incompetence of several patronage hires, he was

required to bring in backup to cover their positions.  *Id.* at 2489, 2506–07.  But Tomczak and

Dan Katalinic, former deputy commissioner of street operations for Streets and Sanitation,

testified that they did not submit names of unqualified workers to IGA for patronage slots.  *Id.* at

2159 (Katalinic); *id.* at 2549, 2551 (Tomczak).

While the commissioner of each department officially had final authority over personnel

decisions, several witnesses testified that IGA actually had the final say.  *See id.* at 1193:12–17

(Kosiba); *id.* 1647–48 (Drumgould); *id.* 2215 (Katalinic).  Falcon testified that she was told that

she should always deny IGA having any role in hiring.  *Id.* at 291, 294:13–14 (Falcon was told

that "if anybody asked [her] about IGA's involvement in the hiring process, that [she] should

---

[8] Drumgould did testify that he at least checked attendance and disciplinary records for those
whose names were provided by IGA.  Trial Tr. 1507.

always deny, deny, deny"). While Falcon was never threatened with an adverse employment action if the names on the "blessed list" were not hired, she testified that she manipulated rating forms and falsely signed *Shakman* certifications because it was her job and "part of the culture."[9] *Id.* 558:19.

Some of these same witnesses also testified about seeking help from Sorich and McCarthy in their roles as political coordinators. Falcon, Katalinic, Tomczak, and Iacullo all discussed the process of seeking positions for those who worked in their political organizations. *Id.* at 522–25 (Falcon); *id.* at 1995, 2018–19 (Katalinic); *id.* at 2459–67 (Tomczak); *id.* at 2742–43 (Iacullo). Not all the names presented to Sorich or McCarthy at IGA would appear on the lists, however. *See id.* at 1065, 1068 (Kosiba); *id.* at 1525 (Drumgould testified that coordinators usually submitted twice as many names as they were going to receive places for); *id.* at 2047 (Katalinic). Kosiba testified Sorich told him this was because he had many people coming to him with requests. *Id.* at 1097:7–13. Union contracts also restricted IGA's influence over certain hiring sequences. *Id.* at 1593. In fact, some individuals whose names were offered based on political work had to wait several rounds of hiring before receiving their desired jobs or promotions. *See, e.g.*, *id.* at 1028 (testimony of Dennis Henderson, a house drain inspector).

In order to track the requests he received, Sorich maintained lists with pertinent information. From 1990 to 1997, this list took the form of a computer database that, as of late 1997, included over 5,400 entries of individual job applicants with accompanying political

---

[9] Other witnesses testified similarly, that while they were never threatened that they would lose their job if they did not follow IGA's direction, they considered it to be part of their job to do so and worried that noncompliance could in fact lead to reassignment or termination. *See* Trial Tr. 920:22–25 (testimony of Joseph Gagliano, deputy commissioner for operations at Sewers from 1993 to 2002); 1110:18–22, 1111–12 (Kosiba); 1752 (Drumgould).

sponsors. *Id.* at 4097. Although Sorich attempted to destroy the computerized list in 1997, it was recovered and turned over to the FBI that year. Sorich's secretary, Patricia Molloy, testified that she kept track of the database and later kept a similar list in word processing programs and on paper. *Id.* at 4074–76, 4086, 4102–03, 4110. At Sorich's direction, she shredded the paper files in 2002, *id.* at 4111–12, and deleted the computer files in 2003, *id.* at 4113–14.

## III.    Closing Arguments

In closing, the government reiterated its position that the city's official hiring process was a charade, for beneath the interviews and rating forms was a shadow process based on political considerations. *Id.* at 4848–49. The government argued that the labor that served private political interests was paid for with city jobs and city money. *Id.* at 4849:11–14. While petitioners were "invested with a public trust," the government contended that they "honored a different kind of trust": "trust in a corrupt clout machine." *Id.* at 4855:4–7. Their actions were thus a "perversion of the public trust." *Id.* at 4855:22. The government represented that it was asking the jury to convict petitioners of "a scheme to defraud the City of Chicago of money and property and of honest services that they were obligated to provide in exchange for their City salaries." *Id.* at 4856:3–5. Simplifying, it maintained that a crime occurred because "[p]eople got jobs and they got them because [petitioners] lied and because documents were falsified." *Id.* at 4856:11–13. The result, in many cases, was that unqualified people got jobs, requiring others to be shifted over to back these individuals up, at a cost to the city and its taxpayers. *Id.* at 4866:3–10. While not about taking money, petitioners' actions nonetheless amounted to corruption because they involved "stealing jobs from the City of Chicago," its payroll, and its taxpayers in "the service of . . . private political interests." *Id.* at 4876:21–25; *see also id.* at

4877:1–4 ("Put another way, this case is about secretly and fraudulently using the public payroll, the payroll funded by the taxpayers of this city to reward the people who did the politics, who knocked on the doors."). According to the government, petitioners' scheme deprived the city of its "right to hire the best employees, not the employees the corrupt clout machine wanted on the team." *Id.* at 4928:10–12; *see also id.* at 4928:15–16 (scheme was "about taking the city's money and property and giving it to the criminal clout machine"). The patronage scheme was run "at the expense of both the city, which was stuck with the bill, and the people of the city, who were misled about the hiring process." *Id.* at 4943:18–21. The government asserted that petitioners knew that the rating forms and *Shakman* certifications were false and that they were violating the *Shakman* decree, rhetorically asking "[t]hat's honest services?" *Id.* at 4944:14. It continued:

> The only people to whom [petitioners] were honest were the insiders of the criminal clout machine. The appearance was that they were acting in the best interest of the city, and that they were acting in the best interest of . . . its people by having interviews for jobs and picking people based on their merit, on their qualifications. The reality – the reality is that they were committing fraud and lying. Acting in the best interest only of the criminal clout machine.
>
> . . . .
>
> What the defendants gave the people and the City of Chicago were their dishonest services. They took city money. They set up sham interviews, they faked ratings, and they falsified documents so that city dollars could fund their political workers and their buddies.

*Id.* at 4944:15–4945:5.

Sorich argued that no one lost any money on a promotion, so the government had not proven that the scheme was to steal money or property or the intangible right to honest services. *Id.* at 4995:6–10. McCarthy argued that he never promised or guaranteed anyone a job but

9

instead only made recommendations. *Id.* at 5014–15. He also contended that he received "absolutely nothing" as a result of his actions. *Id.* Both McCarthy and Sorich maintained that if petitioners' scheme was to get people jobs who did political work, it was not a very effective one, as only a portion of those recommended for jobs actually got them. *Id.* at 4967 (Sorich); *id.* at 5063–64 (McCarthy). Slattery argued that there were legitimate reasons for IGA to be involved in the hiring process. *Id.* at 5127. He also emphasized that there was no evidence that he attempted to obtain jobs for his political workers based on their political work. *Id.* at 5148.

In rebuttal, the government emphasized that petitioners misused their office by "stealing city jobs . . . in order to subsidize and otherwise facilitate the campaigns of favored politicians and awarding those who acted as foot soldiers in this patronage army by giving them city jobs and city promotions paid for by the taxpayers." *Id.* at 5169:23–5170:3. It argued that the scheme served private, not public, ends and, while good for those who went along with the political work, "came at the expense of those who chose not to work on weekends and at night in favor of candidates that they could care less about." *Id.* at 5179:8–12. The government argued that petitioners' actions constituted fraud, "whether or not it's fraud relating to a *Shakman* violation." *Id.* at 5216:22–23. The fact that the city had to pay to be cheated out of property and jobs was "more than adding insult to injury." *Id.* at 5240:16–20. The government told the jury to

> [u]nderstand that this scheme was meant to deprive the people of more than money in performing these jobs. Something more important, and it's the reason why Ms. Ruder said, this is every bit as important as a bribery scheme in terms of corruption. Because this scheme, like any of the schemes, that deprives the people of the trust they placed in their employees is a depravation [sic] of honest service. That itself is a violation of the federal mail fraud statute.

*Id.* at 5242:4–11.

## IV.    Jury Instructions

The jury was instructed that, in order to sustain a charge of mail fraud, the government

must prove beyond a reasonable doubt:

> First, that [petitioners] knowingly devised or participated in the scheme to defraud
> or to obtain money or property by means of materially false pretenses,
> representations, promises, or material omissions as charged.

> Second, that [petitioners] did so knowingly and with the intent to defraud.

> And third, for the purpose of carrying out the scheme or attempting to do so,
> [petitioners] used or caused the use of the United States mail in the manner
> charged in the particular count.

*Id.* at 5271:18–5272:4.  The scheme to defraud was defined as

> a scheme that is intended to deceive or cheat another and to obtain money or
> property or intended to cause the loss of money or property to another or intended
> to deprive a governmental entity of the honest services of its employees for
> personal gain to a member of the scheme or another.

*Id.* at 5273:1–6.  Intent to defraud was defined similarly:

> that the acts charged were done knowingly with the intent to deceive or cheat the
> City of Chicago and the people of the City of Chicago in order to cause a gain of
> money or property to [petitioners] or others or the potential loss of money or
> property to another, or to deprive the City of Chicago and the people of the City
> of Chicago of their right to the honest services of their public employees.

*Id.* at 5277:11–18.  The court further defined honest services for the jury as requiring petitioners

to "conduct themselves in a manner consistent with" certain city, state, and federal laws, decrees,

and policies, including the *Shakman* decree.  *Id.* at 5273:10–5275:22.  The jury was instructed

that a *Shakman* violation occurs where "a defendant caused someone to be hired or promoted

because of the defendant's belief that the job candidate had engaged in political activity."  *Id.* at

5276:12–15.  But it was also instructed that the mere violation of the *Shakman* decree was not

automatically a violation of federal law and that, in addition to finding such a violation, the jury

must also find that petitioners "intended to misuse their positions for private gain for themselves or others" to convict based on honest services fraud.  *Id.* at 5276:16–23.

## ANALYSIS

Relief under § 2255 "is reserved for extraordinary situations."  *Hays* v. *United States*, 397 F.3d 564, 566 (7th Cir. 2005) (quoting *Prewitt* v. *United States*, 83 F.3d 812, 816 (7th Cir. 1996)).  A district court must grant a § 2255 motion when the petitioner establishes "that the district court sentenced him in violation of the Constitution or laws of the United States or that the sentence was in excess of the maximum authorized by law or is otherwise subject to collateral attack."  *Id*. at 566–67 (quoting *Prewitt*, 83 F.3d at 816).

The indictment charged petitioners under two alternative theories of mail fraud: defrauding the city and its taxpayers of (1) money and property, and (2) the right to petitioners' honest services as city officials.  The jury instructions tracked this language, using the disjunctive *or*.  A general verdict form was tendered to the jury, allowing it to convict on either theory without specifying whether its verdict was based on only one theory (and which) or both. Petitioners argue that their convictions must be vacated based on the Supreme Court's decision in *Skilling*, which narrowed the scope of honest services fraud to cover only bribery and kickback schemes.[10]  *Skilling*, 130 S. Ct. at 2931.  They contend that the jury instructions were defective because the jury was allowed to convict petitioners on an honest services theory

---

[10] By not raising any argument against applying *Skilling* retroactively to this § 2255 petition, the government apparently concedes that it does.  The Supreme Court did not express whether its decision applies retroactively on collateral review.  District and appellate courts may make the determination. *Ashley* v. *United States*, 266 F.3d 671, 673 (7th Cir. 2001).  The Seventh Circuit recently declined to decide the question, noting the government's waiver of a limitations defense, but stated that *Davis* v. *United States*, 417 U.S. 333, 94 S. Ct. 2298, 41 L. Ed. 2d 109 (1974), and *Bousley* v. *United States*, 523 U.S. 614, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998), "imply an affirmative answer."  *Ryan* v. *United States* (*Ryan II*), --- F.3d ----, 2011 WL 2624440, at *1 (7th Cir. July 6, 2011).

without evidence of bribery or kickbacks, of which there admittedly was none. The government

concedes that, in light of *Skilling*, the honest services jury instructions were erroneous.[11] While

the jury was also instructed that it could find petitioners guilty based on a valid money or

property theory, a general verdict was returned. As the verdict could have been based on

alternative theories of guilt, one of which is now legally invalid, constitutional error occurred.

*Id.* at 2934 (citing *Yates* v. *United States*, 354 U.S. 298, 77 S. Ct. 1064, 1 L. Ed. 2d 1356 (1957)).

Although an instructional error occurred, reversal is not automatic. *Id.* Instead, the court

must consider whether the error was harmless. *Id.* The parties agree that, in this case, the

harmless error standard set forth for collateral review in *Brecht* v. *Abrahamson*, 507 U.S. 619,

113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993), applies. *See Hedgpeth* v. *Pulido*, 555 U.S. 57, 58,

62–63, 129 S. Ct. 530, 172 L. Ed. 2d 388 (2008); *United States* v. *Lopez*, Nos. 10 C 5075, 07 CR

580-1, 10 C 5077, 07 CR 580-4, 2011 WL 1630900, at *2 (N.D. Ill. Apr. 29, 2011). *But see*

*Ryan* v. *United States* (*Ryan I*), 759 F. Supp. 2d 975, 982–83 (N.D. Ill. 2010), *aff'd*, 2011 WL

2624440 (7th Cir. July 6, 2011). Under *Brecht*, instructional error is harmless unless, in light of

the record as a whole, it "had substantial and injurious effect or influence in determining the

---

[11] The government does not argue that petitioners have procedurally defaulted their claim by failing to raise on direct review the argument that the honest services fraud instructions were erroneous because they did not restrict honest services fraud to bribery and kickbacks. In a recent collateral attack on a conviction based on *Skilling*, despite the government's contention that the claim was not procedurally defaulted, the Seventh Circuit considered procedural default nonetheless. *Ryan II*, 2011 WL 2624440. It found that petitioner had failed to argue at trial and on direct review that § 1346 should be limited to bribery and kickbacks, requiring him to establish cause and prejudice before the instructional error could be addressed. *Id.* at *2. Here, petitioners made numerous challenges to the honest services theory at trial and on direct review. *See United States* v. *Sorich* (*Sorich II*), 523 F.3d 702, 706–07 (7th Cir. 2008) ("The defendants' chief argument on appeal is that the district court's jury instructions on honest services mail fraud impermissibly expand the scope of that crime beyond the statute."). The court concludes that these challenges sufficiently preserved petitioners' claim, even though they did not specifically anticipate the Supreme Court's limitation of § 1346 to bribery and kickbacks, something apparently few predicted. *See Skilling*, 130 S. Ct. at 2940 (Scalia, J., concurring) ("Until today, no one has thought . . . that the honest-services statute prohibited only bribery and kickbacks.").

jury's verdict." *Brecht*, 507 U.S. at 637–38 (quoting *Kotteakos* v. *United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946)). If, in applying this standard, the court has "grave doubt" as to the harmlessness of the error, relief should be granted. *O'Neal* v. *McAninch*, 513 U.S. 432, 436, 115 S. Ct. 992, 130 L. Ed. 2d 947 (1995). Grave doubt means that "in the judge's mind, the matter is so evenly balanced that [she] feels [her]self in virtual equipoise as to the harmlessness of the error." *Id.* at 435. The Seventh Circuit, however, has not applied *Brecht*, a decision on a challenge to a state conviction under 28 U.S.C. § 2254, to § 2255 petitions. Instead, in considering the harmlessness of an instructional error in the § 2255 context in *Lanier* v. *United States*, 220 F.3d 833, 839 (7th Cir. 2000), the Seventh Circuit adopted the standard announced by the Supreme Court in *Neder* v. *United States*: "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" 527 U.S. 1, 18, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999). Despite the government's insistence that this court is not bound by *Lanier* because the Seventh Circuit applied it "without analysis," Gov't Resp. at 4 n.2, the court will follow *Lanier*, a more onerous standard for the government.[12] The court's conclusion would be the same under *Brecht*.

The government maintains that the erroneous honest services instructions were harmless because petitioners' scheme necessarily involved property loss. Thus, according to the government, the jury could not have convicted petitioners of honest services fraud without also finding against petitioners on the money or property theory advanced at trial. Petitioners argue,

---

[12] The Seventh Circuit may find it appropriate to reconsider the standard that should be used for harmless error review in this situation, considering the views of the several circuits that have extended *Brecht* to § 2255 petitions. *See, e.g.*, *United States* v. *Dago*, 441 F.3d 1238, 1246 (10th Cir. 2006); *United States* v. *Montalvo*, 331 F.3d 1052, 1057–58 (9th Cir. 2003); *Ross* v. *United States*, 289 F.3d 677, 682 (11th Cir. 2002); *Murr* v. *United States*, 200 F.3d 895, 906 (6th Cir. 2000).

however, that the government relied almost exclusively on the honest services theory of fraud at trial, that the property theory was undefined, and that the jury's verdict does not necessarily imply a finding of property deprivation. Despite petitioners' claims as to the focus of the trial on one theory over another, the outcome of the harmless error analysis ultimately depends on whether a finding of guilt based on the honest services theory necessarily required a finding that petitioners' actions deprived the city and its taxpayers of money or property.

## I.     Was Property Deprivation Essential to the Honest Services Theory?

The government argues that the honest services and money or property theories presented at trial were coextensive. It relies on cases decided after the Supreme Court's decision in *McNally* v. *United States*, 483 U.S. 350, 107 S. Ct. 2875, 97 L. Ed. 2d 292 (1987), which invalidated the honest services fraud theory (albeit only briefly, as Congress reinstated the theory by enacting § 1346 the following year). These cases are instructive, as they too considered whether an instructional error like that here was harmless when an alternate theory of money or property fraud was presented to the jury.[13] The Seventh Circuit, in addition to courts across the country, almost uniformly concluded that the instructional error was harmless where a deprivation of money or property was necessary to a finding of honest services fraud. *See, e.g.*, *United States* v. *Folak*, 865 F.2d 110, 113 (7th Cir. 1988); *United States* v. *Wellman*, 830 F.2d 1453, 1462–63 (7th Cir. 1987); *Ryan*, 795 F. Supp. 2d at 1005 n.14 (collecting cases); *see also United States* v. *Doherty*, 867 F.2d 47, 58 (1st Cir. 1989); *United States* v. *Asher*, 854 F.2d 1483,

---

[13] The post-*McNally* cases were generally decided on direct review, with the courts employing the heightened "harmless beyond a reasonable doubt" standard. Petitioners maintain that these cases were decided under the wrong standard but that, even under this standard, reversal would be warranted. It appears that petitioners fail to recognize that the standard employed in the post-*McNally* cases is more favorable to them than *Brecht*.

1494 (3d Cir. 1988).  This is the approach taken by courts post-*Skilling* as well.  *See United States* v. *Segal*, --- F.3d ----, 2011 WL 1642831, at *2 (7th Cir. May 3, 2011); *Black*, 625 F.3d at 392–93; *Ryan I*, 759 F. Supp. 2d at 1005–06; *United States* v. *Botti*, 722 F. Supp. 2d 207, 217 (D. Conn. 2010) (defendant not entitled to judgment of acquittal or new trial where "there is absolutely no basis in the record to support any theory undergirding [defendant's] honest services mail fraud conviction other than bribery").

In this case, the evidence was sufficient to establish fraud under a money or property theory.[14]  The indictment alleged that it "was part of the scheme . . . to provide financial benefits, in the form of City jobs and promotions, in exchange for campaign work" and that Sorich and McCarthy "corrupted the City's personnel process by directing the awarding of jobs and promotions in non-policymaking positions to candidates pre-selected by IGA through sham and rigged interviews."  Crim. R. 140, ¶ 17A.  Witnesses testified at length about how certain city employees obtained their jobs and promotions based on political considerations and not on the requirements established in the city's hiring policies and procedures.  There was testimony on the misrepresentations that petitioners and others made in order to ensure that chosen individuals received available jobs and promotions.  While the property right was not specified in the jury instructions, petitioners did not object that the instruction was too vague.  The government made clear in both its opening and closing presentations that the property at stake was the deprivation of city jobs and money, emphasizing that petitioners' scheme stole jobs from the city to reward

---

[14] While petitioners disputed (and to some extent continue to dispute) whether the city has a property right in city jobs and whether any loss was actually suffered because the city would have filled the jobs regardless, the Seventh Circuit rejected this argument on direct appeal, *Sorich II*, 523 F.3d at 712–23, and nothing has occurred since that would call this conclusion into question.  *See Segal*, 2011 WL 1642831, at *2 (reiterating that "[l]oss is not required to prove fraud, whether monetary or otherwise"); *Ryan I*, 759 F. Supp. 2d at 1006–07 (collecting cases).

political workers and deprived the city of its "right to hire the best employees, not the employees the corrupt clout machine wanted on the team." Trial Tr. 4928:10–12.

But the jury was not instructed that it must find that petitioners engaged in money or property fraud. It was also presented with an alternative honest services theory upon which it could base its verdict. In order to convict based on an honest services theory, the jury had to find that petitioners "intended to deprive a governmental entity of the honest services of its employees for personal gain to a member of the scheme or another." *Id.* at 5273:4–6; *see also id.* at 5276:18–23 ("In order to be found guilty of defrauding the City and the people of the City of the right to the honest services of its employees as charged in Counts 2, 3, 4, 5, and 6 of the indictment, the defendants must have intended to misuse their positions for private gain for themselves or others."). While private gain was required, what constituted private gain was not further defined. As in *Black* and *Segal*, the court must determine whether the jury might have convicted petitioners of depriving the city of their honest services for private gain but not have convicted them of money or property fraud. *See also Messinger* v. *United States*, 872 F.2d 217, 221 (7th Cir. 1989) ("[W]e must now examine the indictment, the evidence, and the jury instructions to see if the jury necessarily had to convict Messinger for defrauding Cook County of its property right . . . notwithstanding any intangible rights theory employed.").

While the government argues that the case involved only one fraudulent scheme, requiring the jury to have found money or property fraud in order to find honest services fraud, petitioners maintain that the private gain element required for honest services fraud need not necessarily have been the city jobs and promotions awarded to political workers. On direct appeal, the Seventh Circuit characterized the private gain as "enriching (with jobs) thousands of

individuals who worked for the campaigns of the [petitioners'] paymasters." *Sorich II*, 523 F.3d at 708. Petitioners posit, however, that "the jury may well have concluded that the 'private gain' for which [they] allegedly misused their positions was the *political advantage* that Democratic candidates obtained from controlling the patronage system," a gain that does not amount to money or property. Sorich Reply at 8; *see* Trial Tr. 78:21–79:1 ("By subsidizing the political operations of the Mayer's [sic] political organization, who was endorsing and helping aldermen, state representatives, attorney general candidates, presidential candidates, they were getting – while they got the benefit, the taxpayers were paying to reward the low level workers who were knocking on the doors."); *id.* at 4928:16–19 ("[The scheme] was about the ability of the criminal clout machine to get political workers out into the field to help the candidates for whatever positions the bosses wanted supported."). As an initial matter, very little, if any, evidence was introduced on the advantages reaped from having a political organization, with the vast majority of the evidence focused instead on how the patronage system operated, including the fact that individuals engaged in political work to obtain city jobs and promotions. But even accepting that the jury concluded that the private gain involved was political advantage, this political advantage necessarily came at the expense of city jobs. This is clear even from petitioners' phrasing of the possible gain and the government's references during trial to political advantage, for control of the patronage system meant deciding who got what jobs in the city. So while Democratic candidates may have gained political advantage from petitioners' scheme, that gain depended on city jobs being handed out based on illegitimate political considerations. *See id.* at 4945:4–5 (petitioners acted "so that city dollars could fund their political workers and their buddies"); *id.* at 5179:3–5 (scheme aimed "to create an army of workers who were motivated by

18

the possibility of City employment, by the possibility of good jobs, of better jobs, to knock on doors, to call on phones, to hand out leaflets, to serve in the aid of the favored politicians to reap the benefits of the clout machine"). Thus, under the evidence presented, a jury convicting petitioners of honest services fraud must have also concluded that petitioners were guilty of money or property fraud. *See Segal*, 2011 WL 1642831, at *2 ("[T]o the extent Segal was depriving others of his honest services, it was because he was taking their money.").

This conclusion is further supported by the fact that the case involved only one fraudulent scheme: awarding city jobs and promotions to individuals based on political considerations despite the outward appearance that all city hiring policies and procedures were being followed. *See Messinger*, 872 F.2d at 224 ("Because there was only one scheme alleged, the jury necessarily had to find Messinger guilty of defrauding Cook County of its property right in order to find him guilty of mail fraud."); *United States* v. *Bonansinga*, 855 F.2d 476, 478–79 (7th Cir. 1988) ("[T]he indictment charges but a single scheme to defraud which had the dual effect of depriving the public of both tangible (money and property) and intangible (honest and faithful service) rights. . . . [E]ven assuming that these allegations were (in form at least) separate, the government could not logically prove one scheme without proving the other since the elements of the two were identical." (quoting *Wellman*, 830 F.2d at 1463)). The Seventh Circuit acknowledged that "getting the city to award jobs to political workers and cronies was the very object of the defendants' scheme." *Sorich II*, 523 F.3d at 713; *see also Sorich I*, 427 F. Supp. 2d at 828 ("The deprivation of the power to control spending is not a simple by-product of the scheme in this case."). Further, the indictment only alleged private gain in the form of jobs and promotions. *See* Crim. R. 140, ¶ 17A ("It was part of the scheme . . . to provide financial

benefits, in the form of City jobs and promotions, in exchange for campaign work. . . . As part of this scheme, [Sorich and McCarthy] corrupted the City's personnel process by directing the awarding of jobs and promotions in non-policymaking positions to candidates pre-selected by IGA through sham and rigged interviews . . . ."). Slattery was alleged to have manipulated and falsified "the ostensibly merit-based ratings" in order to award jobs and promotions to applicants who had been selected based on political or other considerations.[15] *Id.* ¶¶ 24, 26. The evidence, with its focus on petitioners' actions in rigging the hiring and promotion process in order to reward political workers and other favored individuals, did not deviate from the indictment's alleged outlines of the single scheme. Because the jury necessarily had to find property loss to convict petitioners on either theory, the court must conclude that the inclusion of the honest services instructions was harmless error.

---

[15] In a separate reply, Slattery argues that the only count on which he was convicted is more akin to honest services fraud than money or property fraud because it charged a mailing to a union concerning a promotion sequence instead of, as in the other counts, a mailing announcing a hiring or promotion. The letter discussed how promotions were made and was charged to have been sent in furtherance of the scheme of awarding positions to political workers. As the private gain involved does not depend on the content of the mailing charged in each count, Slattery's argument is unpersuasive.

## II.    Focus on Honest Services Fraud During Trial

For the sake of completeness, the court will briefly address petitioners' remaining

arguments that the honest services theory predominated throughout the trial.  To support their

argument, petitioners cite various passages from the government's opening statement and closing

arguments that emphasize honest services fraud.  *See, e.g.*, Trial Tr. 33:10–11 ("[T]his is a case

about breach of the public trust."); *id.* at 4855:22 (petitioners' actions constituted a "perversion

of the public trust"); *id.* at 5242:8–11 ("[T]his scheme, like any of the schemes, that deprives the

people of the trust they placed in their employees is a depravation [sic] of honest service.  That

itself is a violation of the federal mail fraud statute.").  But this is just cherry-picking.  As

discussed above, the honest services and money or property theories were alternative bases

advanced to support the criminality of the same scheme.  An equal number of quotations from

the government's presentation could be marshaled that discuss how petitioners' actions deprived

the city of the right to control jobs and the taxpayers of the right to have their money go toward

jobs that were awarded honestly and according to city policies.  *See, e.g.*, *id.* at 42:13–14 ("[T]he

currency and the fuel and the gasoline for this scheme were [city] jobs."); *id.* at 4876:20–24 ("In

this particular case though it may not be about taking money, it is about stealing jobs from the

City of Chicago.  The defendants who participated in this mail fraud scheme stole jobs from the

City payroll.  They stole jobs funded by the taxpayers."); *id.* at 4877:1–4 ("Put another way, this

case is about secretly and fraudulently using the public payroll, the payroll funded by the

taxpayers of this city to reward the people who did the politics, who knocked on the doors."); *id.*

at 5240:17 ("[T]he City was cheated out of property and jobs.").  The government did state in

closing that the deprivation of honest services was "[s]omething more important" than the

deprivation of jobs and "itself . . . a violation of the federal mail fraud statute." *Id.* at 5242:5–11. But the jury was instructed that it could not convict on an honest services theory unless it found private gain. As the jury is presumed to follow its instructions, *see Soltys* v. *Costello*, 520 F.3d 737, 744 (7th Cir. 2008), and the court has already concluded that the private gain must have involved the city's property loss, this statement does not affect the court's conclusion.

Petitioners repeat their argument that the government sought to equate their violation of the *Shakman* decree with guilt under the honest services theory. It is true that much of the evidence at trial related to *Shakman* violations. But the evidence of *Shakman* violations supports the government's money or property theory just as much as the honest services theory, as it demonstrates that city jobs and money were used to advance political interests and not the interests of the city and its people. As the government responds, this evidence would have been part of the case even if an honest services theory had not been pursued. Moreover, the jury was instructed that mere violation of the *Shakman* decree was not automatically a federal crime. *See* Trial Tr. 5276:16–23. As private gain was also required for conviction under the honest services theory, the jury could not have convicted petitioners based merely on a *Shakman* violation.

Finally, petitioners claim that the emphasis on the honest services theory in the jury instructions demonstrates that the instructional error was not harmless. Although the jury instructions on the honest services theory were more extensive than those on the money or property theory, this does not mean that the honest services theory was the exclusive focus of the case or that the jury focused solely on it. In fact, some of the honest services instructions were proposed by petitioners. The money or property theory did not require as extensive definition, as it simply required the jury to find that petitioners sought "to obtain money or property or

intended to cause the loss of money or property to another," terms that do not require further legal explanation. Petitioners do not propose additional instructions that should have been included for the money or property theory, except to point out that the instructions did not specify the property right at stake. The instructions were based on the Seventh Circuit's pattern criminal jury instructions, which do not indicate that the property right need be specified. As mentioned above, petitioners did not object to the fact that the property right was not defined at trial or on direct appeal and so cannot complain of that now. Further, the jury was not left wondering what property was at stake; the government made clear in both its opening and closing presentations that the property at issue was city jobs and the right to control how city money was spent. Because either theory required the jury to find a loss of city property, the instructional error was harmless and the § 2255 petitions must be denied.

## III.    Certificate of Appealability

Pursuant to Rule 11(a) of the Rules Governing Section 2255 Cases, the court must issue or deny a certificate of appealability when it enters a final order adverse to a petitioner. With respect to claims of constitutional violations denied on their merits, a habeas petitioner is entitled to a certificate of appealability only if he can make a substantial showing of the denial of a constitutional right. *See Miller-El* v. *Cockrell*, 537 U.S. 322, 327, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (citing 28 U.S.C. § 2253(c)(2)). To make a substantial showing the petitioner must show that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack* v. *McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000) (quoting *Barefoot* v. *Estelle*, 463 U.S. 880, 893 n.4, 103 S. Ct.

3383, 77 L. Ed. 2d 1090 (1983)). The requirement of a certificate of appealability is a threshold issue and a determination of whether one should issue neither requires nor permits full consideration of the factual and legal merits of the claims. "The question is the debatability of the underlying constitutional claim, not the resolution of that debate." *Miller-El*, 537 U.S. at 342. As post-*Skilling* case law, particularly on collateral review, is still evolving and could benefit from further development by the appellate court, a certificate of appealability will be granted.

## CONCLUSION AND ORDER

For the foregoing reasons, Sorich's, McCarthy's, and Slattery's § 2255 petitions are denied. A certificate of appealability is granted. This case is terminated.

Dated: August 4, 2011          ENTER:_____

                                        JOAN HUMPREY LEFKOW
                                        United States District Judge